THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

DANIEL GENE BOZE,
JIMMY JOE BOZE, and
MARY RUTH BOZE, Surviving
Spouse of Joe Boze,

     Plaintiffs,

     v.                         Case No.

GREAT AMERICAN
INSURANCE COMPANY,

     Defendant.

## COMPLAINT

COME NOW the Plaintiffs, Daniel Gene Boze, Jimmy Joe Boze and Mary Ruth Boze,

Surviving Spouse of Joe Boze, by and through counsel, and for their causes of action against

the Defendant, Great American Insurance Company, state as follows:

### I. PARTIES

1. Plaintiff Daniel Gene Boze is an adult resident citizen of Carthage, Smith County,

Tennessee.

2. Plaintiff Jimmy Joe Boze is an adult resident citizen of Carthage, Smith County,

Tennessee.

3. Plaintiff Mary Ruth Boze, Surviving Spouse of Joe Boze, is an adult resident

citizen of Carthage, Smith County, Tennessee.

4.  Defendant Great American Insurance Company is a foreign corporation organized and existing under the laws of the State of Ohio.  The Defendant may be served with process of this Court by serving copies of the Summons and Complaint upon an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process, including its registered agent for service of process:

Great American Insurance Company
301 E. 4th Street, 15th Floor
Cincinnati, Ohio 45202-4201

## II. JURISDICTION AND VENUE

5.  The Plaintiffs' causes of action arise from actions, events and omissions of the Defendant, its employees, agents and servants, that occurred in the Middle District of Tennessee.  There is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.  Therefore, the United States District Court for the Middle District of Tennessee has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, and venue is proper in this Court's Northeastern Division pursuant to 28 U.S.C. §1391.

## III. FACTS

7.  In crop year 2017, Great American Crop Insurance Company ("GAIC") provided Multiple Peril Crop Insurance ("MPCI") coverage to Daniel Gene Boze, Jimmy Joe Boze, and the late Joe Boze, under three (3) separate policies of Multi-Peril Crop Insurance (MPCI), GAIC Policy No. 2017-TN-084-111546, 2017-TN-084-111551 and 2017-TN-084-111549. *See* Exhibit 1 (*Basic Provisions* of the *Common Crop Insurance Policy*).

8.  Joe Boze passed away during the 2017 crop year, on June 9, 2017, at which time "the named insured on [his] policy automatically convert[ed] to the name of [his] spouse"

under Section 2(g) of the Basic Provisions of the Common Crop Insurance Policy. Therefore, at the time of the arbitration, Plaintiff Mary Ruth Boze held all right and interest in and to Policy No. 2017-TN-084-111549 as Joe Boze's widow.

9.  Each of the three (3) Plaintiffs paid in full the premium charged for the MPCI coverage afforded, except for the $7,463 ($125,537 - $118,074) in addition premium associated with the additional coverage due under a corrected Schedule of Insurance furnished at the time of the arbitration.

10.  By letter dated February 23 and signed March 1, 2018, GAIC Claims Manager Jamie Finlayson communicated GAIC's determination that each of the three (3) policyholders failed to follow good farming practices as defined by the *Basic Provisions* of the *Common Crop Insurance Policy* and that the policyholders' losses were due exclusively to the uninsured cause of loss (*i.e*., Plaintiffs' failure to follow good farming practices).

11.  The *Basic Provisions* of the *Common Crop Insurance Policy* defines "good farming practices" as follows:

> **Good farming practices** - The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance, including any adjustments for late planted acreage, which are: (1) For conventional or sustainable farming practices, those generally recognized by agricultural experts for the area; or (2) for organic farming practices, those generally recognized by organic agricultural experts for the area or contained in the organic plan. We may, or you may request us to, contact FCIC to determine whether or not production methods will be considered to be "good farming practices."

*See* Exhibit 1 (*Basic Provisions*) at 3.

12.  GAIC's initial GFP determination may be summarized as follows:

(a) The Plaintiffs' used muriate of potash (0-0-60), or MOP, in the Spring of 2017,

- 3 -

rather than sulfate of potash (0-0-50), or SOP, excessive amounts of which can cause high levels of chloride, which can cause curing and quality issues;

(b) The Plaintiffs' soil samples indicated 250 pounds of nitrogen (N) was recommended to produce the goal of 2,500 pounds of Burley tobacco per acre, which was representative of their actual production history;

(c) The Plaintiffs' pre-emergence herbicide program, which included a tank mix of two quarts of Devrinol herbicide, eight ounces of Spartan herbicide and 16 ounces of Prowl herbicide per acre, were judged "very low rates";

(d) The Plaintiffs' post-emergence herbicide program included an off-label application of Fusilade DX herbicide; and

(e) The Plaintiffs' did not hand-hoe (chop) weeds from the tobacco fields "after mechanical cultivation was no longer feasible."

13.  Under the terms of the MPCI policy, Defendant GAIC, as an "approved insurance provider" (AIP), "makes decisions regarding what constitutes good farming practices and determinations of assigned production for uninsured causes for [the insured's] failure to use good farming practices." *Id.* at ¶20(d).

14.  If the producer disagrees with the AIP's good farming practices decision, he "must request a determination from FCIC of what constitutes a good farming practice." If he disagrees with the AIP's "determination of the amount of assigned production, [he] must use the arbitration process." *Id.*

15.  The Plaintiffs followed this bifurcated process, filing formal requests with GAIC that were reviewed by the Jackson Regional Office of Risk Management Agency (RMA), an agency within the USDA created to supervise the FCIC and administer its reinsurance program. *See* 7 USC §6933(a), (b)(1)-(3).

16.  The result of the Jackson RO's good farming practices review and a further reconsideration by the Deputy Administrator of RMA was the determination "that [the Bozes] did follow an adequate fertilization application"; that "the overapplication of muriatic potash did not likely reduce [the Plaintiffs'] burley tobacco yields"; and that the "preemergence herbicide program was documented as adequate."

17.  RMA determined that the Plaintiffs "did ***not*** follow good farming practices because they failed to implement appropriate [post-emergence] weed control measures."

18.  In its August 27, 2019, reconsideration determination, RMA noted that "[t]he failure to follow the recognized good farming practices may not be the only reason [the] Burley tobacco crop suffered a loss. . . . [The GFP determination and] reconsideration solely verifies whether [the Plaintiffs] followed generally recognized good farming practices. It does not determine whether an insurable cause of loss, such as drowned tobacco plants, exists." *Id.*

19.  Although the "[RMA] decided that three of the four good farming practices failures [GAIC] had identified were in fact not good farming practices failures," GAIC did not reconvene its claims staff or otherwise review or attempt to update its initial GFP determination and the assignment of 100 percent of each of the Plaintiffs' 2017 Burley tobacco losses to the uninsured cause of loss (*i.e*., failure to follow good farming practices).

20.  Likewise, GAIC did not seek the opinion of any agricultural expert (prior to Dr. Gary Palmer's recent retention by counsel in the litigation) to try to quantify that the damage

or the production loss that should be assigned to these two remaining issues, the off-label application of Fusilade DX herbicide and hand-hoeing.

21. By its own admission, the Defendant did nothing in response to the May 13, 2019, and August 27, 2019, GFP determinations and reconsiderations except review them, scan them and put them in the files, even though the Plaintiffs (through their attorney) requested that GAIC reconsider its assessment of 100 percent of the loss to the uninsured cause of failure to follow good farming practices and demanded payment of the indemnity due under the subject MPCI policies.

22. On August 26-28, 2020, the parties appeared before the Honorable Michael L. Russell, the duly designated and appointed Arbitrator pursuant to *Manager's Bulletin MGR-12-003.1* and Section 20 of the *Basic Provisions* of the *Common Crop Insurance Policy*, and presented their evidence at the arbitration hearing in Brentwood, Tennessee. *See* Exhibit 1 (*Basic Provisions*) at ¶20.

23. By Arbitration Award dated November 2, 2020, the Honorable Michael L. Russell made specific findings of facts regarding the evidence presented over the three (3) day arbitration, concluding, "To the extent that the Claimants failed to follow good farming practices by failing to implement appropriate or additional post-emergence weed control measures [the application of additional or alternative herbicide or hand-hoeing], those failures did not cause or contribute to the [Plaintiffs'] losses in yield or quality in their 2017 Burley tobacco crop." *See* Exhibit 2 (Arbitration Award) at ¶91.

24. The Arbitrator's detailed analysis of the evidence presented produced the following findings of fact:

> 21. The Respondent, by and through its attorney and witnesses, concedes that "[RMA] decided that three of the four good farming practices failures [GAIC had

identified were in fact not good farming practices failures." *See* Arbitration Transcript at 28:20-25, 29:1-2; 184:19-23; 686:25, 687:1-7.

22. Both the Claimants and the Respondent accepted the August 27, 2019, GFP reconsideration determination made by RMA, and neither party sought judicial review of that final administrative decision.

23. Despite the reversal of three of the four GFP determinations, GAIC concedes that it did not reconvene its claims staff or otherwise review or attempt to update its initial GFP determination and the assignment of 100 percent of each of the Claimants' 2017 Burley tobacco losses to the uninsured cause of loss (*i.e.*, failure to follow good farming practices). *See* Finlayson Deposition at 55:11-21.

24. Likewise, GAIC concedes that it did not seek the opinion of any agricultural expert (prior to Dr. Palmer's recent retention by counsel in the litigation) to try to quantify that the damage or the production loss that should be assigned to these two remaining issues, the off-label application of Fusilade DX herbicide and hand-hoeing. *See* Arbitration Transcript at 679:13-18.

25. According to the sworn testimony of GAIC Claims Manager Jamie Finlayson, the Respondent did nothing in response to the May 13, 2019, and August 27, 2019, GFP determinations and reconsiderations except review them, scan them and put them in the files, even though the Claimants (through their attorney) requested that GAIC reconsider its assessment of 100 percent of the loss to the uninsured cause of failure to follow good farming practices. *See* Finlayson Deposition at 53:3-9; 54:14-20; Respondent's Exhibit 30.4.

26. The Claimants offered into evidence two other 2017 Burley tobacco claims, the claims of Larry Brown and Nicholas Brown from nearby Clay County, Tennessee, and Barren, Cumberland, Metcalfe and Monroe Counties, Kentucky. *See* Claimants' Exhibits 82 & 83.

27. The Brown claims were worked by the same GAIC claims staff as the Claimants' claims (Jacob Partridge and John Hunter Ward) and were denied by the Respondent for failure to follow good farming practices as it related to the use of muriate of potash (0-0-60), or MOP, in the Spring of 2017. *Id.*

28. Respondent GAIC concedes that the Brown claims were paid in full following a similar reversal by RMA on the single issue of the Browns' failure to follow good farming practices by using MOP in the Spring of 2017. *See* Arbitration Transcript at 692:21-25.

29. The causes of the Browns' losses, as determined by Respondent GAIC, were Excessive Moisture/Precipitation and Hurricane/Tropical Depression (and in the case of Nicholas Brown's Barren, Cumberland and Monroe County claims, Excessive Moisture/Precipitation and Hurricane/Tropical Depression and Drought). *See* Claimants' Exhibits 82 & 83.

30. The Claimants also offered evidence regarding Joe Darren Boze's 2017 Burley tobacco claims in Smith and Trousdale Counties, Tennessee, with a different AIP, ARMtech Insurance Company. *See* Claimants' Exhibit 32.

31.  Joe Darren Boze is the brother of Daniel Boze and the son of Jimmy Joe Boze, and the separate MPCI policy was written by his wife, an agent for a competing AIP, ARMtech Insurance Services.

32.  Daniel Boze testified that Joe Darren's Burley tobacco was part of the Boze family farming operation, that the crop was tended in the same manner as that of the Claimants, and that the crop was in close proximity to the Claimants' Burley tobacco.  *See* Arbitration Transcript at 42:10-16.

33.  Daniel Boze further testified that the Joe Darren Boze claim was paid in full by ARMtech after an audit made necessary by his familial relationship with the agent of record, Joe Darren's wife.  *See* Arbitration Transcript at 123:13-20.

34.  The ARMtech claim documentation confirms that Joe Darren Boze's 2017 Burley tobacco claim was paid in full and the cause of loss was determined to be 100 percent Excessive Moisture/Precipitation.  *See* Claimants' Exhibit 32.

35.  Respondent GAIC concedes that the Claimants' 2017 Burley tobacco was subject to excessive rainfall and flooding during the 2017 crop year, and each of the GAIC claims staff confirm in their written reports and their sworn testimony the presence of persistent and excessive rainfall "in June, July, August, September and even in the first part of October."  *See* Arbitration Transcript at 436:1-7.

36.  Daniel Boze, Jimmy Joe Boze and Mike Sircy testified, and the GAIC witnesses confirmed, that much of the Claimants' land is low lying and subject to flooding.

37.  The nature of the land and its propensity to flood was certainly known to the Respondent and presumably reflected in the coverage afforded and the premium charged each of the three (3) Claimants.

38.  Respondent GAIC concedes that excessive rainfall, precipitation, and moisture, including flooding, are all insured causes of loss and covered perils under the MPCI policy issued to the Claimants, to Joe Darren Boze, to Larry Brown and to Nicholas Brown.

39.  Respondent GAIC asserts that "Federal law places the burden upon the insured to establish that his production loss is due to an insured cause of loss and that he has complied with all provisions of the policy."  *See* Respondent's Pre-Hearing Brief at 8, citing 7 CFR §457.7.

40.  Respondent GAIC also cites the *Loss Adjustment Manual Standards Handbook*, or LAM, which provides that "[t]he insured must establish the COL [cause of loss]," but adds that "the adjuster will:  (a) Verify the COL during the on-the-farm inspection [and] (b) Be satisfied that the damage or loss is due to one or more insured cause(s) of loss."  *See* Respondent's Exhibit 6 at ¶841(4), p. 143.

41.  In addition, Section 1221 of the LAM instructs the adjuster that, where both insured and uninsured causes are present, he must "determine the amount of loss due to uninsured cause(s)" by "visual inspection of production on same or similar crop(s) on other farms in the area to identify the possible presence of an uninsured

COL, and if needed, compare productivity and yields of surrounding farms." *See* Respondent's Exhibit 6 at ¶1221C(1), p. 285.

42.  Section 1221 of the LAM further instructs the adjuster to "Verify the COLs (e.g. apparent loss may be poor weed control; however, the damage may have been indirectly caused by insufficient rainfall to activate a properly applied herbicide)." *Id.* at ¶1221C(2), p. 285.

43.  Section 1221 of the LAM also instructs the adjuster to "Determine and document on separate appraisal worksheets, the amount of damage attributed to uninsured and insured COL [using] (a) Agricultural expert's published materials or written opinion as to the yield loss attributable to the insurable and uninsurable COL; or (b) Comparison of productivity and yields of surrounding farms." *Id.* at ¶1221C(3), p. 285.

44.  Section 1221A(7) of the LAM provides: "Judgment is extremely important for establishing production lost due to uninsurable COLs. A working knowledge of cultural practices and technical aspects of growing the crop in the area as well as scientifically sound research and publications from agricultural experts is essential." *Id.* at ¶1221A(7), p. 284.

45.  Here, the Claimants assert, and the Respondent concedes, that the Claimants' 2017 Burley tobacco crops sustained damage due to one or more insured causes of loss – excessive precipitation/moisture, including flooding, and in the case of Claimant Jimmy Joe Boze's FSN 800, wind. *See* Arbitration Transcript at 421:9-11; Respondent's Exhibit 11.5.

46.  Likewise, both the Claimants and the Respondent accept the final administrative determination of RMA that the Claimants' post-emergence herbicide program included an off-label application of Fusilade DX herbicide and the Claimants' did not hand-hoe (chop) weeds from all of the tobacco fields after mechanical cultivation was no longer feasible.

47.  The Claimants contend that their losses were due entirely to the insured causes of loss; notably excessive precipitation/moisture, which impacted their Burley tobacco crop directly and indirectly, including a degradation of their pre-emergence herbicide regimen determined to by adequate by the RMA.

48.  Respondent GAIC offered no evidence at the arbitration of other Burley tobacco yields in the area, suggesting instead that there was not much Burley tobacco in the area. *See* Arbitration Transcript at 656:14-18; Respondent's Exhibit 24.1, p. 2.

49.  According to Claims Manager Jamie Finlayson, Respondent GAIC concluded that there was no way to assign a relative percentage of loss due to the off-label application of Fusilade to the Burley tobacco crop and the failure to hand-hoe more of the crop. *See* Arbitration Transcript at 693:5-17; *see also* Finlayson Deposition at 60:17-25, 61:1-2.

50.  The Claimants, on the other hand, offered the expert opinion testimony of Daniel Gene Boze, Jimmy Joe Boze, Smith County Farmers Cooperative Manager Mike Sircy and Certified Crop Advisor Josh Thurman that 100 percent of the

Claimants' reduction in yield and quality in their 2017 Burley tobacco crop was due to excessive precipitation/moisture.

51. Furthermore, the Claimants offered actual Burley tobacco yields from Joe Darren Boze, who farmed in close proximity to the Claimants, and from the Browns, who farmed Burley tobacco in nearby counties, whose losses were attributed exclusively to insured causes of loss (including excessive precipitation/moisture). *See* Claimants' Exhibits 32, 82 & 83.

52. The Production Worksheet Summary and the Proof of Loss documents admitted into evidence reflect that the Burley tobacco acreage of Joe Darren Boze and the Browns produced net production to count figures consistent with those of the Claimants. *See* Claimants' Exhibits 32, 82 & 83.

53. Each of the Claimants' witnesses testified that, while Fusilade DX was not labeled for Burley tobacco, its use in the place of Poast herbicide was not uncommon.

54. The Claimants' witnesses confirmed that they were unaware of even a single case of crop injury from the post-application of Fusilade DX and that neither the Claimants' 2017 crop nor the photographs taken by the GAIC adjusters evidenced any herbicide injury.

55. The GAIC claims personnel confirmed that there was no apparent crop injury from the off-label application of Fusilade DX.

56. There was no evidence presented to suggest that any of the Claimants' Burley tobacco was rejected due to the use of Fusilade DX, and Daniel Boze confirmed that the Bozes had never had any tobacco turned down for use of Fusilade. *See* Arbitration Transcript at 105:11-14.

57. The Respondent's expert witness, Dr. Gary Palmer, Professor Emeritus at the University of Kentucky, likewise confirmed in his arbitration testimony that there was no evidence that the off-label application of Fusilade caused any injury to any of the Claimants' 2017 Burley tobacco. *See* Arbitration Transcript at 514:22-25, 515:1-3.

58. The Claimants and their experts also testified as to the effectiveness of the Fusilade DX in killing grass in the Bozes' 2017 Burley tobacco crop.

59. The Respondent's expert, pointing to the tell-tale "purpling" of the Johnson grass and demonstrative control in GAIC photographs, testified that he did not "doubt the effectiveness of the herbicide" *See* Arbitration Transcript at 515:19-25, 516:1-3.

60. Dr. Palmer testified, "[Poast is] legal and Fusilade is not, very same efficacy." *See* Arbitration Transcript at 515:19-25, 516:1-3.

61. Accordingly, GAIC Claims Manager Jamie Finlayson confirmed in his arbitration testimony that "there is no legitimate issue or question about whether the

Fusilade worked" or that the off-label application injured the Boze tobacco. *See* Arbitration Transcript at 680:9-12; 681:1-4.

62. On the subject of hand-hoeing, or chopping, the Claimants' witnesses testified that no additional hand-hoeing would have reduced the Claimants' losses in yield or quality. Arbitration Transcript at 236:15-21; 253:25, 254:1-2.

63. Dr. Palmer confirmed that hand-hoeing, or chopping, is neither feasible nor common in its use and would have been "largely ineffective" unless there was "very little weed pressure." *See* Arbitration Transcript at 498:17-21; 516:4-12.

64. Dr. Palmer wrote in his expert report, "Handing chopping or hoeing, while a traditional means of weed control, is only successful under limited weed pressure. Attempts to chop or hoe out tobacco with high weed pressure would most likely be unsuccessful." *See* Respondent's Exhibit 33 at 7.

65. While the GAIC claims staff relied heavily the *2017-2018 Burley and Dark Tobacco Production Guide* (to the exclusion of an agricultural expert), that publication mentions hand-hoeing just one time, in the following context:

> Field cultivation and hand-hoeing are also traditional methods to maintain good weed control post-transplant, but effective herbicide control options decrease the need for mechanical control methods.

*See* Claimants' Exhibit 53 at 26; Respondent's Exhibit 34 at 26.

66. The clear implication from the foregoing passage is that "traditional means of weed control," like labor-intensive hand-hoeing, have given way to modern herbicide regimens, and that conclusion is supported by the testimony of the Claimants and the expert witnesses.

67. In this specific case, Dr. Palmer testified that none of the weed pressure that he saw in the photographs could have been alleviated simply by hand chopping. *See* Arbitration Transcript at 516:22-25, 517:1-4.

68. The testimony of the Claimants and their expert witnesses, as well as that of Dr. Palmer, make clear that excessive rainfall and resulting wet field conditions, including flooding, have both a direct and indirect adverse impact on Burley tobacco.

69. Each of the expert witnesses, including Dr. Palmer, explained that a tobacco plant with "wet feet" (*i.e.*, roots in wet soil conditions) suffers from yellowing of the plant and stunting of the plant and may wither and die through the growing season.

70. The photographs offered into evidence, as narrated by the Bozes and the GAIC claims personnel, reflect skips in the otherwise uniform rows and spacing of the Burley tobacco transplanted by the Claimants.

71. On cross-examination, Dr. Palmer compared the impact of "wet feet" over time as spreading "almost like a cancer in the field." *See* Arbitration Transcript at 523:9-12.

72. Dr. Palmer further confirmed the testimony of the Clamants and their experts that the tobacco plants injured by early rainfall events are more susceptible to injury or damage from subsequent heavy rainfall events and other environmental conditions like disease, thereby compounding the injury to the surviving tobacco plants. *See* Arbitration Transcript at 523:15-22.

73. The Claimants and their expert witnesses, together with Dr. Palmer, explained that "repeated rainfall events . . . have the impact of leaching away the residual herbicide . . . and nutrients, natural and manmade and applied." *See* Arbitration Transcript at 524:3-7.

74. In contrast to the Burley tobacco plant that is suited to an arid climate and is sensitive to wet soil conditions, the competing weeds that are deposited by flood waters and accumulate in seed banks that survive for years have evolved and acclimated to thrive and survive more readily in these less than hospitable growing environments. *See* Arbitration Transcript at 524:17-25, 525:1-10.

75. Based upon the evidence presented, I find that each of the Claimants sustained significant injury and loss in yield and quality in their 2017 Burley tobacco crops as the direct and indirect result of excessive precipitation and moisture.

76. Although the presence of broadleaf weeds and grass may have adversely impacted the Claimants' Burley tobacco yield, the clear consensus among the tobacco growers and experts who testified, including the Respondent's expert, Dr. Gary Palmer, is that the repeated adverse weather events (*i.e.*, excessive rainfall) caused or contributed significantly to the presence, growth and proliferation of the weeds due to the leaching away of the Claimants' pre-emergence herbicide and fertilizer.

77. I note that the provisions of the LAM offered by GAIC as Respondent's Exhibit 6, Paragraph 1221, include the following guidance:

> **Example**: Loss due insured taking (sic) inadequate measures to control insects, plant disease, or weeds when such measures are practical and have proven effective in the area, which is considered avoidable and is an uninsured COL. However, if the insured uses recognized and accepted measures to control insects or plant disease (insured COL) or weeds, these causes are considered unavoidable insured COLs. Although weeds are not a stated insured COL, FCIC will consider damage caused by weeds as insured if recognized and accepted control measures were used, or if adverse weather directly caused the control measures to be less effective.
>
> * * *
>
> (2) Verify the COLs (e.g. apparent loss may be poor weed control; however, the damage may have been indirectly caused by insufficient rainfall to activate a properly applied herbicide).

*See* Respondent's Exhibit 6 at ¶1221, page 283, 285.

78.  The explanation offered by the Claimants and their expert witnesses is not only contemplated in the LAM, but was echoed in the email communications of the GAIC claims personnel:

> Probably need them to document if there are other farms in the area that are comparable, if any. Need for them to give us a dissertation on what could have caused the excessive weed pressure and if they have any weather records to back it up.
>
> I noticed that in some of the pictures that the tobacco looks yellowish and burnt looking on the leaves, what causes that?
>
> Was it a case of potential excessive moisture in the area causing issues and the weeds got away from them due to the moisture? I guess this could be explained if there were comparable fields in the area.

*See* Respondent's Exhibit 24.1 at 2.

79.  Having reviewed all of the evidence presented, it is clear that the Claimants experienced just the scenario that Mr. Finlayson suggested in his email.

80.  Without any available post-emergence herbicide for the broadleaf weeds, the Claimants remedial efforts were limited to a post-emergence herbicide application that targeted grass.

81.  Although the application of Fusilade DX herbicide was contrary to the product label and therefore not a good farming practice, there is no evidence before me that the application of Poast herbicide in its place would have controlled the grass any more effectively than the off-label application of Fusilade DX.

82.  Given the evidence presented that the application of Fusilade DX herbicide did not harm the Claimants' Burley tobacco and was no less effective than the application of Poast herbicide would have been, the only remaining question is whether the application of more herbicide to additional acres would have produced additional yield or quality in the Claimants' Burley tobacco.

83.  Here, the testimony of Daniel Boze, largely confirmed by the GAIC claims staff, established that all reasonable efforts were being made to cultivate and spray the Burley tobacco, subject to the limitations imposed by environmental conditions.

84.  The uncontroverted testimony established that the Claimants had on hand sufficient herbicide and adequate equipment to effect the control of the grass but for repeated rains that made application with the Bozes' spray rigs dangerous or impracticable.

85.  Daniel Boze testified that in his attempts to spray the Claimants' Burley tobacco acreage for grass, he got stuck three times, evidencing a genuine effort to control weeds in the Claimants' Burley tobacco.

86. Daniel Boze testified that he applied the grass control herbicide on the acreage that had grass pressure, but not where there were no longer any viable tobacco plants.

87. Burley tobacco experts Mike Sircy and Josh Thurman testified that none of the photographs taken by the parties and offered at trial depicted viable tobacco acreage where the post-emergence application of herbicide would have produced additional marketable tobacco. *See* Arbitration Transcript at 221:13-23; 254:10-25.

88. Although hand-hoeing was an available means of post-emergence weed control and part of a good farming practice, the evidence presented by tobacco growers and tobacco experts, including Dr. Palmer, makes clear that additional hand-hoeing by the Claimants would not have produced additional marketable tobacco.

89. Therefore, I find insufficient evidence to suggest that the Claimants' losses in yield and quality were caused or contributed to by the Claimants' application of Fusilade DX herbicide rather than Poast herbicide.

90. I likewise find insufficient evidence to suggest that the Claimants' losses in yield and quality were caused or contributed to by the Claimants' failure to employ additional cultivation or hand-hoeing of the crop.

91. To the extent that the Claimants failed to follow good farming practices by failing to implement appropriate or additional post-emergence weed control measures, those failures did not cause or contribute to the Claimants' losses in yield or quality in their 2017 Burley tobacco crop.

92. Rather, I find that each of the Claimants' 2017 Burley tobacco losses were caused 100 percent by excessive precipitation and moisture.

93. While Dr. Palmer's rainfall-yield model may be of significant value to the tobacco industry in predicting yields over a large area, its inherent limitations, owing to lack of specific rainfall and yield records, make Dr. Palmer's predictive model of little evidentiary value in this arbitration.

94. The parties agree that, to date, the Claimants have been paid no indemnity under their respective policies.

95. Furthermore, with the admission of Respondent's Exhibit 10.1A, the corrected Schedule of Insurance for Claimant Daniel Gene Boze, there is no dispute as to the coverage afforded each of the Claimants' insured units of Burley tobacco. *See* Claimants; Exhibits 62A, 63 & 64; Respondent's Exhibits R-10.1A, R-10.2 & R-10.3.

96. Likewise, the testimony of both the Claimants and the Respondent establish that the "production to count" for each of the Claimants' insured units of Burley tobacco is set forth in the Production Worksheet Summaries. *See* Claimants' Exhibits 46, 47 & 48; Respondent's Exhibits R-23.1, R-23.2 & R-23.3.

97. In calculating the indemnity due each of the Claimants, I have subtracted the production to count figures from the coverage figures in accordance with Claimants' Exhibit 58-A.

98. Based upon the foregoing, I find that the Claimants are entitled to indemnity as follows:

| Insured | Policy No. | Indemnity | Premium | Net Indemnity |
|---|---|---|---|---|
| Daniel G. Boze | 2017-TN-084-111546 | $458,759 | $7,463 | $451,296 |
| Jimmy Joe Boze | 2017-TN-084-111549 | $295,985 | $ 0 | $295,985 |
| Mary Ruth Boze | 2017-TN-084-111551 | $402,393 | $ 0 | $402,393 |

*See* Claimants' Exhibit 58-A.

99. In addition, I find that the Claimants are entitled to interest pursuant to Section 26 of the *Basic Provisions* as of October 1, 2020, and per diem interest thereafter as follows:

| Insured | Policy No. | Interest | Per Diem |
|---|---|---|---|
| Daniel G. Boze | 2017-TN-084-111546 | $26,237.24 | $14.14 |
| Jimmy Joe Boze | 2017-TN-084-111549 | $16.927.88 | $ 9.12 |
| Mary Ruth Boze | 2017-TN-084-111551 | $23,013.59 | $12.40 |

*See* Claimants' Exhibit 58-A.

*See* Exhibit 2 (Arbitration Award) at ¶¶21-99.

25. Thereafter, Defendant GAIC made payment to the Plaintiffs as follows:

| Insured | Policy No. | Indemnity | Interest |
|---|---|---|---|
| Daniel G. Boze | 2017-TN-084-111546 | $451,296 | $26,802.84 |
| Jimmy Joe Boze | 2017-TN-084-111549 | $295,985 | $17,356.52 |
| Mary Ruth Boze | 2017-TN-084-111551 | $102,394 | $23,596.39 |

26. Section 20 of the *Basic Provisions* of the *Common Crop Insurance Policy*

provides in relevant part:

**20. Mediation, Arbitration, Appeal, Reconsideration, and Administrative and Judicial Review.**
(a) If you and we fail to agree on any determination made by us except those specified in section 20(d) or (e), the disagreement may be resolved through mediation in accordance with section 20(g). If resolution cannot be reached through mediation, or you and we do not agree to mediation, the disagreement must be resolved through arbitration in accordance with the rules of the American Arbitration Association (AAA), except as provided in sections 20(c) and (f), and unless rules are established by FCIC for this purpose. Any mediator or arbitrator with a familial, financial or other business relationship to you or us, or our agent or loss adjuster, is disqualified from hearing the dispute.

(1) All disputes involving determinations made by us, except those specified in section 20(d) or (e), are subject to mediation or arbitration. However, if the

- 15 -

dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, either you or we must obtain an interpretation from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC.

> (i) Any interpretation by FCIC will be binding in any mediation or arbitration.
> (ii) Failure to obtain any required interpretation from FCIC will result in the nullification of any agreement or award.
> (iii) An interpretation by FCIC of a policy provision is considered a determination that is a matter of general applicability.
> (iv) An interpretation by FCIC of a procedure may be appealed to the National Appeals Division in accordance with 7 CFR part 11.

(2) Unless the dispute is resolved through mediation, the arbitrator must provide to you and us a written statement describing the issues in dispute, the factual findings, the determinations and the amount and basis for any award and breakdown by claim for any award. The statement must also include any amounts awarded for interest. Failure of the arbitrator to provide such written statement will result in the nullification of all determinations of the arbitrator. All agreements reached through settlement, including those resulting from mediation, must be in writing and contain at a minimum a statement of the issues in dispute and the amount of the settlement.

(b) Regardless of whether mediation is elected:

(1) The initiation of arbitration proceedings must occur within one year of the date we denied your claim or rendered the determination with which you disagree, whichever is later;
(2) If you fail to initiate arbitration in accordance with section 20(b)(1) and complete the process, you will not be able to resolve the dispute through judicial review;
(3) If arbitration has been initiated in accordance with section 20(b)(1) and completed, and judicial review is sought, suit must be filed not later than one year after the date the arbitration decision was rendered; and
(4) In any suit, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure, an interpretation must be obtained from FCIC in accordance with 7 CFR part 400, subpart X or such other procedures as established by FCIC. Such interpretation will be binding.

(c) Any decision rendered in arbitration is binding on you and us unless judicial review is sought in accordance with section 20(b)(3). Notwithstanding any provision in the rules of the AAA, you and we have the right to judicial review of any decision rendered in arbitration.

* * *

(f) In any mediation, arbitration, appeal, administrative review, reconsideration or judicial process, the terms of this policy, the Act, and the regulations published at 7 CFR chapter IV, including the provisions of 7 CFR part 400, subpart P, are binding. Conflicts between this policy and any state or local laws will be resolved in accordance with section 31. If there are conflicts between any rules of the AAA and the provisions of your policy, the provisions of your policy will control.

* * *

(h) Except as provided in section 20(i), no award or settlement in mediation, arbitration, appeal, administrative review or reconsideration process or judicial review can exceed the amount of liability established or which should have been established under the policy, except for interest awarded in accordance with section 26.

(i) In a judicial review only, you may recover attorneys fees or other expenses, or any punitive, compensatory or any other damages from us only if you obtain a determination from FCIC that we, our agent or loss adjuster failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in you receiving a payment in an amount that is less than the amount to which you were entitled. Requests for such a determination should be addressed to the following: USDA/RMA/Deputy Administrator of Compliance/ Stop 0806, 1400 Independence Avenue, SW., Washington, D.C. 20250-0806.

*See* Exhibit 1 (*Basic Provisions*) at ¶20.

27. Pursuant to Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs have this day requested a "determination from FCIC that [Great American and its] loss adjuster[s] failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in [the Plaintiffs] receiving a payment in an amount that is less than the amount to which [they] were entitled." *Id.* at ¶20(i); *see* Exhibit 3 (Section 20 (i) Request to FCIC).

28. The Plaintiffs now seek judicial review and the "recover[y of] attorneys fees [and] other expenses, [and] punitive, compensatory [and] other damages" as contemplated by Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*.

29. In addition, Plaintiffs seek the recovery of their attorney's fees and expenses, together with punitive, compensatory, and other damages as permitted by Tennessee law.

30. As a direct and proximate result of Defendant GAIC's "[failure] to comply with the terms of the MPCI policy and procedures issued by FCIC," the Plaintiffs have incurred substantial and continuing damages beyond the $1,217,528.72 in indemnity wrongfully withheld by GAIC.

31. The Plaintiffs' economic damages include, but are not limited to, the cost of interest to service their crop production debt with Smith County Bank; the forced sale and liquidation of farm land, farm equipment, cattle and other farm assets at "fire sale" prices; the loss of leased lands under favorable terms; the loss of the use of farm assets in which the Plaintiffs had invested with the reasonable expectation of an ongoing farm operation; and the loss of income from the Plaintiffs' ongoing farming operation, including but not limited to revenue produced from the sale of tobacco and USDA farm subsidy and relief programs.

32. The Plaintiffs' noneconomic damages include, but are not limited to, the mental and emotional stress associated with the loss of the $1,217,528.72 in indemnity wrongfully withheld by GAIC and resulting economic and financial hardship imposed upon the family farm operation.

33. In securing the recovery of the $1,217,528.72 in indemnity properly payable under the Plaintiffs' 2017 MPCI policies, the Plaintiffs have incurred attorney's fees in the amount of forty percent (40%) of the total recovery, as well as $30,432.86 in expenses related to the successful arbitration of their claims.

34. Thus, even after a full and complete vindication of the Plaintiffs and their position, the Plaintiffs have not been made whole and remain largely uncompensated for the improper actions of GAIC in direct contravention of the express terms of the subject MPCI policy and the published directives of FCIC.

35. The Plaintiffs retain and preserve all rights and remedies available to them under State and Federal law, including those asserted herein, and specifically reserve the right to amend their Complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.

# IV. CAUSES OF ACTION

## COUNT I – JUDICIAL REVIEW (SECTION 20)

36. Pursuant to Section 20 of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs seek judicial review and the "recover[y of] attorneys fees [and] other expenses, [and] punitive, compensatory [and] other damages."

37. Pursuant to Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs have this day requested a "determination from FCIC that [Great American and its] loss adjuster[s] failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in [the Plaintiffs] receiving a payment in an amount that is less than the amount to which [they] were entitled." *Id.* at ¶20(i); *see* Exhibit 3 (Section 20 (i) Request to FCIC).

38. As a direct and proximate result of Defendant GAIC's "[failure] to comply with the terms of the MPCI policy and procedures issued by FCIC," the Plaintiffs have incurred substantial and continuing damages beyond the $1,217,528.72 in indemnity wrongfully withheld by GAIC.

39. Pursuant to Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs are entitled to recover their economic damages which include, but are not limited to, the cost of interest to service their crop production debt with Smith County Bank; the forced sale and liquidation of farm land, farm equipment, cattle and other farm assets at "fire sale" prices; the loss of leased lands under favorable terms; the loss of the use of farm assets in which the Plaintiffs had invested with the reasonable expectation of an ongoing farm operation; and the loss of income from the Plaintiffs' ongoing farming

- 19 -

operation, including but not limited to revenue produced from the sale of tobacco and USDA farm subsidy and relief programs.

40. The Plaintiffs' economic damages are no less than $1,000,000.

41. The Plaintiffs are further entitled to recover their noneconomic damages which include, but are not limited to, the mental and emotional stress associated with the loss of the $1,217,528.72 in indemnity wrongfully withheld by GAIC and resulting economic and financial hardship imposed upon the family farm operation.

42. The Plaintiffs' noneconomic damages are no less than $1,000,000.

43. The Plaintiffs are further entitled to recover their attorney's fees and expenses incurred in securing the recovery of the $1,217,528.72 in indemnity, which are no less than $487,011.49 and $30,432.86, respectively.

44. The Plaintiffs are further entitled to recover punitive damages in an amount sufficient to punish the Defendant and to deter this Defendant and others similarly situated from intentional, malicious, fraudulent and reckless conduct in disregard of the terms of the policy and procedures issued by FCIC.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Daniel Gene Boze, Jimmy Joe Boze and Mary Ruth Boze, Surviving Spouse of Joe Boze, seek judgment of and from the Defendant, Great American Insurance Company, for the recover[y of] attorneys fees [and] other expenses, [and] punitive, compensatory [and] other damages" as provided in Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*; for prejudgment and post-judgment interest; and for such other and further relief as may be just and proper.

## COUNT II – TENNESSEE STATE LAW (CONTRACT)

45.  Plaintiffs restate, re-allege and incorporate by reference the allegations set forth in numbered paragraph 1. through 37. of the Complaint as if set forth herein verbatim.

46.  The actions and inactions of Defendant GAIC constitute a material breach of the written insurance contract between GAIC and each of the Plaintiffs.

47.  Therefore, the Plaintiffs are entitled to recover damages over and above the indemnity due under the subject policies and awarded as part of the mandatory arbitration process prescribed by Section 20 of the *Basic Provisions* of the *Common Crop Insurance Policy*.

48.  Pursuant to Section 20 of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs are entitled to "recover attorneys fees [and] other expenses, [and] punitive, compensatory [and] other damages" under Tennessee law.

49.  Pursuant to Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs have this day requested a "determination from FCIC that [Great American and its] loss adjuster[s] failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in [the Plaintiffs] receiving a payment in an amount that is less than the amount to which [they] were entitled." *Id.* at ¶20(i); *see* Exhibit 3 (Section 20 (i) Request to FCIC).

50.  As a direct and reasonably foreseeable consequence of Defendant GAIC's "[failure] to comply with the terms of the MPCI policy and procedures issued by FCIC," the Plaintiffs have incurred substantial and continuing damages beyond the $1,217,528.72 in indemnity wrongfully withheld by GAIC, and those damages were contemplated by the parties.

51. Pursuant to Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs are entitled to recover their economic damages under Tennessee law, which include but are not limited to, the cost of interest to service their crop production debt with Smith County Bank; the forced sale and liquidation of farm land, farm equipment, cattle and other farm assets at "fire sale" prices; the loss of leased lands under favorable terms; the loss of the use of farm assets in which the Plaintiffs had invested with the reasonable expectation of an ongoing farm operation; and the loss of income from the Plaintiffs' ongoing farming operation, including but not limited to revenue produced from the sale of tobacco and USDA farm subsidy and relief programs.

52. The Plaintiffs' economic damages are no less than $1,000,000.

53. The Plaintiffs are further entitled to recover their noneconomic damages under Tennessee law, which include but are not limited to, the mental and emotional stress associated with the loss of the $1,217,528.72 in indemnity wrongfully withheld by GAIC and resulting economic and financial hardship imposed upon the family farm operation.

54. The Plaintiffs' noneconomic damages are no less than $1,000,000.

55. The Plaintiffs are further entitled to recover under Tennessee law their attorney's fees and expenses incurred in securing the recovery of the $1,217,528.72 in indemnity, which are no less than $487,011.49 and $30,432.86, respectively.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Daniel Gene Boze, Jimmy Joe Boze and Mary Ruth Boze, Surviving Spouse of Joe Boze seek judgment of and from the Defendant, Great American Insurance Company, for the recovery of their compensatory and consequential damages; for prejudgment and post-judgment interest; for reasonable attorney's fees and costs; and for such other and further relief as may be just and proper.

- 22 -

## COUNT III – TENNESSEE STATE LAW (COMMON LAW BAD FAITH)

56. Plaintiffs restate, re-allege and incorporate by reference the allegations set forth in numbered paragraph 1. through 37. of the Complaint as if set forth herein verbatim.

57. The actions and inactions of Defendant GAIC constitute a violation of the implied duty of good faith and fair dealing under the subject insurance contracts, and the Plaintiffs are entitled to extra-contractual damages, including punitive damages, attorney's fees and costs of litigation.

58. The Plaintiffs are entitled to recover their attorney's fees and expenses incurred in securing the recovery of the $1,217,528.72 in indemnity, which are no less than $487,011.49 and $30,432.86, respectively.

59. The Plaintiffs are further entitled to recover punitive damages in an amount sufficient to punish the Defendant and to deter this Defendant and others similarly situated from intentional, malicious, fraudulent and reckless conduct in disregard of the terms of the policy and procedures issued by FCIC.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Daniel Gene Boze, Jimmy Joe Boze and Mary Ruth Boze, Surviving Spouse of Joe Boze seek judgment of and from the Defendant, Great American Insurance Company, for punitive damages, attorney's fees and costs; for prejudgment and post-judgment interest; and for such other and further relief as may be just and proper.

## COUNT IV – TENNESSEE STATE LAW (STATUTORY BAD FAITH)

60. Plaintiffs restate, re-allege and incorporate by reference the allegations set forth in numbered paragraph 1. through 37. of the Complaint as if set forth herein verbatim.

61. The Plaintiffs made repeated demands upon Defendant GAIC to pay the indemnity due under the subject policies, or to reconsider its assessment of 100 percent of the guarantee due to uninsured causes.

62. The Plaintiffs' demands include the September 4, 2019, letter of their attorney, which followed the conclusion of the Good Farming Practice (GFP) determination by RMA and the receipt of the GFP determination letter dated August 27, 2019. *See* Exhibit 4 (Post-GFP Demand Letter).

63. Defendant GAIC failed and refused to pay the Plaintiffs MPCI claims within sixty (60) days after demand was made, including the Plaintiffs' September 4, 2019, demand.

64. The Defendant's refusal to pay the loss was not in good faith, and the failure to pay inflicted additional expense, loss, and injury, including attorney fees and costs, upon the Plaintiffs.

65. Therefore, the Plaintiffs are entitled to recover damages under Tenn. Code Ann. 56-7-105.

66. Pursuant to Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs are entitled to recover their economic damages under Tenn. Code Ann. 56-7-105, which include but are not limited to, the cost of interest to service their crop production debt with Smith County Bank; the forced sale and liquidation of farm land, farm equipment, cattle and other farm assets at "fire sale" prices; the loss of leased lands under favorable terms; the loss of the use of farm assets in which the Plaintiffs had invested with the reasonable expectation of an ongoing farm operation; and the loss of income from the Plaintiffs' ongoing farming operation, including but not limited to revenue produced from the sale of tobacco and USDA farm subsidy and relief programs.

- 24 -

67. The Plaintiffs' economic damages are no less than $1,000,000.

68. The Plaintiffs are further entitled to recover their noneconomic damages under Tenn. Code Ann. 56-7-105, which include but are not limited to, the mental and emotional stress associated with the loss of the $1,217,528.72 in indemnity wrongfully withheld by GAIC and resulting economic and financial hardship imposed upon the family farm operation.

69. The Plaintiffs' noneconomic damages are no less than $1,000,000.

70. The Plaintiffs are further entitled to recover under Tenn. Code Ann. 56-7-105 their attorney's fees and expenses incurred in securing the recovery of the $1,217,528.72 in indemnity, which are no less than $487,011.49 and $30,432.86, respectively.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Daniel Gene Boze, Jimmy Joe Boze and Mary Ruth Boze, Surviving Spouse of Joe Boze seek judgment of and from the Defendant, Great American Insurance Company, for the recovery of their compensatory and consequential damages under Tenn. Code Ann. 56-7-105; for prejudgment and post-judgment interest; for reasonable attorney's fees and costs under Tenn. Code Ann. 56-7-105; and for such other and further relief as may be just and proper.

## COUNT V – TENNESSEE STATE LAW (TORT)

71. Plaintiffs restate, re-allege and incorporate by reference the allegations set forth in numbered paragraph 1. through 37. of the Complaint as if set forth herein verbatim.

72. The actions and inactions of Defendant GAIC constitute negligence, fraud and misrepresentation, and the Plaintiffs are entitled to recover damages over and above the indemnity due under the subject policies and awarded as part of the mandatory arbitration process prescribed by Section 20 of the *Basic Provisions* of the *Common Crop Insurance Policy*.

- 25 -

73.  Pursuant to Section 20 of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs are entitled to "recover attorneys fees [and] other expenses, [and] punitive, compensatory [and] other damages" under Tennessee law.

74.  Pursuant to Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs have this day requested a "determination from FCIC that [Great American and its] loss adjuster[s] failed to comply with the terms of this policy or procedures issued by FCIC and such failure resulted in [the Plaintiffs] receiving a payment in an amount that is less than the amount to which [they] were entitled." *Id.* at ¶20(i); *see* Exhibit 3 (Section 20 (i) Request to FCIC).

75.  As a direct and proximate result of Defendant GAIC's "[failure] to comply with the terms of the MPCI policy and procedures issued by FCIC," the Plaintiffs have incurred substantial and continuing damages beyond the $1,217,528.72 in indemnity wrongfully withheld by GAIC, and those damages were foreseeable by the Defendant.

76.  Pursuant to Section 20(h) and (i) of the *Basic Provisions* of the *Common Crop Insurance Policy*, the Plaintiffs are entitled to recover their economic damages under Tennessee law, which include but are not limited to, the cost of interest to service their crop production debt with Smith County Bank; the forced sale and liquidation of farm land, farm equipment, cattle and other farm assets at "fire sale" prices; the loss of leased lands under favorable terms; the loss of the use of farm assets in which the Plaintiffs had invested with the reasonable expectation of an ongoing farm operation; and the loss of income from the Plaintiffs' ongoing farming operation, including but not limited to revenue produced from the sale of tobacco and USDA farm subsidy and relief programs.

77.  The Plaintiffs' economic damages are no less than $1,000,000.

78. The Plaintiffs are further entitled to recover their noneconomic damages under Tennessee law, which include but are not limited to, the mental and emotional stress associated with the loss of the $1,217,528.72 in indemnity wrongfully withheld by GAIC and resulting economic and financial hardship imposed upon the family farm operation.

79. The Plaintiffs' noneconomic damages are no less than $1,000,000.

80. The Plaintiffs are further entitled to recover under Tennessee law their attorney's fees and expenses incurred in securing the recovery of the $1,217,528.72 in indemnity, which are no less than $487,011.49 and $30,432.86, respectively.

81. The Plaintiffs are further entitled to recover punitive damages in an amount sufficient to punish the Defendant and to deter this Defendant and others similarly situated from intentional, malicious, fraudulent and reckless conduct in disregard of the terms of the policy, the procedures issued by FCIC and the rights and expectations of the Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Daniel Gene Boze, Jimmy Joe Boze and Mary Ruth Boze, Surviving Spouse of Joe Boze seek judgment of and from the Defendant, Great American Insurance Company, for the recovery of their compensatory and consequential damages; for punitive damages; for prejudgment and post-judgment interest; for reasonable attorney's fees and costs; and for such other and further relief as may be just and proper.

## V. DEMAND FOR JURY TRIAL

COME NOW the Plaintiffs, Daniel Gene Boze, Jimmy Joe Boze and Mary Ruth Boze, and pursuant to Rule 38 of the Federal Rules of Civil Procedure hereby demand a trial by jury of any and all issues so triable.                                        .

Respectfully submitted,

LAW OFFICE OF
WENDELL L. HOSKINS II
404 Ward Avenue
Post Office Box 1115
Caruthersville, Missouri 63830
Phone: 573-333-2600
Fax: 573-333-2041
Wendell@WendellHoskins.com


*Wendell L. Hoskins II*
WENDELL L. HOSKINS II
Tennessee Bar No. 17761
Attorney for the Plaintiffs